**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MARLENE MCKINNEY,** o/b/o Christopher McKinney, an minor, <br><br> **Plaintiff,** <br><br> v. <br><br> **MICHAEL J. ASTRUE,** **Commissioner of Social Security,** <br><br> **Defendant.** | ) ) ) ) ) **Case No. 05 C 5276** ) ) **Magistrate Judge Nan R. Nolan** ) ) ) ) ) |

## **MEMORANDUM OPINION AND ORDER**

The single issue presented in this social security case is whether the final decision of the Commissioner of Social Security finding claimant Christopher McKinney ineligible for Supplemental Security Income due to excess resources during a ten-month period is supported by substantial evidence. The Court concludes that the decision is not supported by substantial evidence and thus reverses the Commissioner's denial of benefits for the period between February and November 2002 and remands this case for further proceedings consistent with this opinion.

### **I. BACKGROUND**

The underlying facts of this case are tragic. Plaintiff Christopher McKinney ("McKinney") was hit by a train in August of 2000 and sustained a traumatic head injury which left him in a coma for several months and then wheelchair bound and quadriplegic. McKinney was born on May 20, 1987 and was 16 years old at the time of the hearing. He suffers from a traumatic incurable brain injury. It is undisputed that McKinney is physically disabled and eligible for SSI.

After McKinney was severely injured, a family friend, Gerald Troglia, organized fund-raising efforts for the McKinney family. On September 1, 2000, a savings account was opened by Mr. Troglia, as well as Ms. McKinney's sisters, Shirley Steffenagen and Lisa Disette. (Tr. 87). The account was entitled "McKinney Relief Fund." Id. On October 14, 2000, a fundraising event was held at the Bourbon Street Restaurant, raising approximately $50,000. (Tr. 157, 162). On October 16, 2000, the account funds were transferred from the savings account to a NOW checking account. (Tr. 96, 97, 130). There was no written agreement regarding disbursement of the funds. (Tr. 175-76). According to the bank records, $39,926.08 was spent from October 2000 to September 2001 (Tr. 135-36). The balance as of October 2001 was $26,554.14. (Tr. 126). The account was closed in June 2003 upon expenditure of all funds. (Tr. 20).

At the administrative hearing, Ms. McKinney stated that her practice was to provide her bills to her sister Shirley Steffenhagen for payment. Ms. McKinney testified: "My sister would say, Do you have any bills? I'd give her my bills. She would pay them." (Tr. 168.). The ALJ found the existence of a valid third-party trust. (Tr. 19, 20). The ALJ stated:

> There was no written trust agreement which would deal with such things as disbursements. However Marlene McKinney testified to a verbal understanding that any bill she wanted paid would be presented to Shirley Steffenhagen and Steffenhagen would in turn write a check drawn against the trust account to pay the bill.

(Tr. 20). The ALJ concluded that McKinney was ineligible for SSI due to excess resources commencing February 22, 2002. (Tr. 21).

The Appeals Council granted McKinney's request for review and on July 15, 2005 issued a final decision. The Appeals Council stated:

> As as established practice, as the claimant's mother incurred bills, she submitted them to one of her sisters. That sister then paid the bills directly by writing checks from the "McKinney Relief Fund." The checks written were for whatever needed to be paid, i.e., for rent, utilities, expenses for the disabled child or her other children, etc. There is no satisfactory evidence that any request for payment of any submitted bill was denied.

(Tr. 8). The Appeals Council found that "[t]he probative evidence of record . . . shows that, by actual history, purpose, and intent the funds in the McKinney Relief Fund were in the form of a constructive trust with Gerald Troglia and Ms. McKinney's sisters acting as her agents, and that Ms. McKinney had the authority to direct the use of the funds for her support and maintenance. Id.

## II. DISCUSSION

McKinney argues, among other things, that the ALJ erred in finding that the third-party trust was a countable resource. Because the Appeals Council granted review of the ALJ's decision, the decision of the Appeals Council, not the ALJ, is the final decision of the Commissioner and the decision on review. Sims v. Apfel, 530 U.S. 103, 106-07 (2000) (stating "SSA regulations provide that, if the Appeals Council grants review of a claim, then the decision that the Council issues, is the Commissioner's final decision."); Browning v. Sullivan, 958 F.2d 817, 822 (7th Cir. 1992). The Court may review the ALJ's initial findings as part of the record as a whole, but "even if the ALJ's determination is supported by substantial evidence, it is the substantial evidence of the Appeal's Council decision that we must consider." White v. Sullivan, 965 F.2d 133, 136 (7th Cir. 1992); Moothart v. Bowen, 934 F.2d 114, 116-17 (7th Cir. 1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). The Appeals Council's decision

contains numerous errors which the Court cannot overlook. For this reason, the Court cannot find that substantial evidence supports the Appeals Council's decision that moneys in the trust fund were a resource which rendered McKinney ineligible for SSI.

"Federal regulations prohibit a person from collecting SSI benefits if that person has more than $2000 in resources available for care or maintenance." White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999). The Social Security regulations define "resources" as "cash or other liquid assets or any real or personal property that an individual (or spouse, if any) owns and could convert to cash to be used for his or her support and maintenance." Id.; 20 C.F.R. § 416.1201(a). "If the individual has the right, authority, or power to liquidate the property or his or her share of the property, it is considered a resource." 20 C.F.R. § 416.1201(a)(1). "If a property right cannot be liquidated, the property will not be considered a resource of the individual (or spouse)." Id.

Both parties rely upon the SSA's Program Operations Manual System ("POMS") in support of their respective positions regarding the trust. "The POMS is a handbook for internal use by employees of the Social Security Administration." Parker v. Sullivan, 891 F.2d 185, 189 n. 4 (7th Cir. 1989). The POMS provides that "[i]f an individual (claimant, recipient, or deemor) has legal authority to revoke the trust and then use the funds to meet his food or shelter needs, or if the individual can direct the use of the trust principal for his/her support and maintenance under the terms of the trust, the trust principal is a resource for SSI." POMS SI 01120.200(D)(1)(a). The ability to direct the use of the trust principal depends on the terms of the trust agreement and/or State law. POMS SI 01120.200(D)(2).

The ALJ, Appeals Council, and Commissioner's attorney agree that the arrangement here involved a valid oral trust under Illinois law. A trust "is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.'" (Emphasis added.) Eychaner v. Gross, 779 N.E.2d 1115, 1131 (Ill. 2002) (citing Restatement (Second) of Trusts § 2 (1959)). "In Illinois, creation of an express trust requires: (1) intent of the parties to create a trust, which may be shown by a declaration of trust by the settlor or by circumstances which show that the settlor intended to create a trust; (2) a definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee." Id. The Appeals Council did not identify the beneficiary of the trust here, and the ALJ found that it was "not clear whether the beneficiary of the trust was the claimant individually or the McKinney family as a whole." (Tr. 20).

The Appeals Council found that the "funds in the McKinney Relief Fund were in the form of a constructive trust with Gerald Troglia and Ms. McKinney's sisters acting as her agents, and that Ms. McKinney had the authority to direct the use of the funds for her support and maintenance." (Tr. 8). The Appeals Council's finding that the McKinney Relief Fund was a constructive trust is not supported by substantial evidence. "A constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct." Charles Hester Enters. v. Illinois Founders Ins. Co., 499 N.E.2d 1319, 1326 (Ill. 1986). "Where property has been acquired wrongfully, the party in

possession may be declared to be a constructive trustee of the property if it would be unjust for that party to retain it." Id. "Some form of wrongful or unconscionable conduct is a prerequisite to the imposition of a constructive trust." Id. "Constructive trusts are divided into two general classes: one in which actual fraud is considered as equitable grounds for raising the trust, and the other, where there exists a fiduciary relationship and subsequent abuse of such relationship." Id. A constructive trust is one raised by operation of law as distinguished from a trust created by express agreement between the settlor and the trustee." Suttles v. Vogel, 533 N.E.2d 901, 904 (Ill. 1988). Because absolutely no evidence of "wrongful or unconscionable conduct" exists here, the Appeals Council erred in finding that the McKinney Relief Fund was a constructive trust.

The Appeals Council also found that Mr. Troglia and Ms. McKinney's sisters simply acted as Ms. McKinney's agents with regard to the trust. By finding an agency relationship, the Appeals Council apparently concluded that the actions of the agents (Mr. Troglia and Ms. McKinney's sisters) with regard to the trust funds were equivalent to the actions of Ms. McKinney. The Court will not affirm the Appeals Council's determination of an agency relationship unless it is supported by specific findings and reasoning. The current record provides no basis on which to review the adequacy of the Appeals Council's conclusion of an agency relationship. "An agency is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf. Generally, the question of whether any agency relationship exists and the scope of the purported agent's authority are questions of fact." Santana v. State Bd. of Elections, 2007 WL 777865, at *7 (Ill. App. 2007). Although the Appeals Council found that "[a]s an

established practice, as the claimant's mother incurred bills, she submitted them to one of her sisters [and] [t]hat sister then paid bills directly by writing checks from the "McKinney Relief Fund," it did not explain the basis for its conclusion that Ms. McKinney had the right to control the method or manner in which funds were distributed from the account and that the agents (Mr. Troglia and Ms. McKinney's sisters) had the ability to subject Ms. McKinney to personal liability–the two elements that are essential to an agency relationship. Id. (stating "[a] principal-agent relationship exists when the principal has the right to control the manner in which the agent performs his work and the agent has the ability to subject the principal to personal liability."). The SSA's own internal handbook makes clear that "[b]ecause the trustee is a fiduciary does not mean that he/she is an agent of the beneficiary." POMS: SI 01120.200(B)(18). Since the record does not reflect an adequate evidentiary and analytical basis for the Appeals Council's agency decision, the Court is unwilling to affirm its finding of an agency relationship.

The relevant question is whether Christopher McKinney (or his mother acting on his behalf) would be permitted under the terms of the trust and/or Illinois law to liquidate the account. See POMS SI 01120.200(D)(2) (stating "the ability to direct the use of the trust principal depends on the terms of the trust agreement and/or on State law."). Neither the Appeals Council nor the ALJ considered the effect of Illinois law.[1] In determining whether

---

[1] McKinney argues that the Appeals Council's finding that Ms. McKinney had the "authority" to direct the use of the funds for her support and maintenance because the trustees were her agents conflicts with Illinois trust law. Relying on the Illinois Trusts and Trustees Act (the "Act"), McKinney argues that the trustees (Ms. McKinney's sisters) had the sole discretion and legal authority to pay the bills of the McKinney family from the trust. See 760 ILCS 5/4. The Trust and Trustees Act does not appear to apply to the trust here. Section 5/3(2) states that with certain exceptions, the Act "applies to every trust created by will, deed, agreement, declaration or other instrument . . . ." Section 5/2 defines "trust" for

Ms. McKinney had the right, authority, or power to liquidate the account under the terms of the trust, the paramount consideration is the settlor's intent. Peck v. Froehlich, 853 N.E.2d 927, 933 (Ill. App. 2006) (stating "[i]n construing a trust, a trial court's first concern is to determine the settlor's intent and give effect to that intent if it is not contrary to public policy." ). The ALJ made no finding as to the settlor's intent. The Court believes the ALJ's failure to consider the settlor's intent in construing the terms of the trust (a necessary fact question) is fatal to his decision. See In re Estate of Mendelson, 697 N.E.2d 1210, 1211-12 (Ill. App. 1998) (noting "[a]s the Illinois Supreme Court has stated, the central purpose of trust construction is to ascertain the settlor's intent from the trust as a whole and to effectuate that intent if not contrary to public policy."). With respect to intent, the Appeals Council stated only: "The probative evidence of record, therefore, shows that, by actual history, purpose, and intent, the funds in the McKinney Relief Fund were in the form of a constructive trust with Gerald Troglia and Ms. McKinney's sisters acting as her agents, and that Ms. McKinney had the authority to direct the use of the funds for her support and maintenance." (Tr. 8). For the reasons previously discussed, no constructive trust exists and the finding of an agency relationship is not supported by substantial evidence. The Appeals Council's apparent finding that it was the settlor's intent for Ms. McKinney to have the authority to direct the use of the funds for her support and maintenance is not supported by substantial evidence because there is no statement or testimony from the settlor (Mr. Troglia) in the record from which to ascertain his intent.

---

purposes of the Act as "a trust created by will, deed, agreement, declaration or *other written instrument*." (emphasis added). Here, the terms of the trust were the oral agreement and no written instrument creating the trust exists.

Contrary to the Commissioner's attorney's argument that there exists a "presumption" that Ms. McKinney had authority to direct money from the fund, the more appropriate presumption is that a beneficiary does not have the authority under a trust to direct the use of the trust principal. See POMS: SI 01120.200(D)(1)(b) (stating a "trust may be a resource to the beneficiary, *in the rare instance*, where he/she has the authority under the trust to direct the use of the trust principal.") (emphasis added). For the reasons explained below, the Court cannot conclude on the current record that this is one of the "rare instances" where the beneficiary (or his mother acting on his behalf) had the right, authority, or power under the terms of the trust to liquidate the account.

"Funds held in a financial institution account (including savings, checking, and time deposits, also known as certificates of deposit) are an individual's resource if the individual owns the account and can use the funds for his or her support and maintenance." 20 C.F.R. § 416.1208(a). How the individual holds the account, as reflected in the way the account is titled, determines whether an individual owns the account and can use the funds for his or her support and maintenance. Id. Neither McKinney's nor his mother's name appeared on the bank account. Moreover, by finding the existence of a valid trust here, the Commissioner concedes that neither McKinney nor his mother held legal title to the funds. In re Estate of Mendelson, 697 N.E.2d at 1212 (stating "[i]n a conventional trust, the trustee holds the legal title and the beneficiary holds the equitable title."); see also POMS: SI 01120.200(B)(4) (stating a "[a] trustee is a person or entity who holds legal title to property for the use of benefit of another" and a "trust beneficiary is a person for whose benefit a trust exists. A beneficiary does not hold legal title to trust property but does have an

equitable ownership in it.").

There is also no evidence that Ms. McKinney ever had possession of the check book or made any withdraws from the account. The Commissioner places great weight on the fact that Ms. McKinney routinely requested and received money from the account to pay for her family's needs, but that does not mean that she had the "right, authority, or power" to liquidate the account. The evidence shows that Ms. McKinney did not have unrestricted access to and control over the trust funds. All requests for distributions were handled by Ms. McKinney's sister Shirley as trustee. See POMS: SI 01120.200(B)(18) (indicating that "[t]he trustee holds the property solely for the benefit of the beneficiary with due care. The trustee owes duties of good faith and loyalty to exercise reasonable care and skill, to preserve the trust property and make it productive and to account for it.). There is no evidence in the record that Ms. McKinney would have had any power to withdraw money from the account or force her sister to make disbursements. Moreover, the fact that none of Ms. McKinney's requests were rejected by the trustee is not dispositive. If Ms. McKinney's sister had denied a request for disbursement, that would be strong evidence that Ms. McKinney did not have the right, authority, or power to liquidate the account. However, the converse is not necessarily true. The fact that Ms. McKinney's sister did not deny a request for disbursement does not mean that Ms. McKinney's requests were binding on the trustees, especially where the Commissioner has not explained why any of Ms. McKinney's requests did not merit use of the funds.

The ALJ and Appeals Council also failed to adequately develop the record by not following the POMS instructions regarding the development and documentation of oral trusts. In cases involving binding oral trusts, the POMS directs SSA employees to "record

all relevant information" and "obtain from all parties signed statements describing the arrangement." SI 01120.200J(2)(a). The only signed statement in the record is from Ms. McKinney. (Tr. 29). Neither the ALJ nor the Appeals Council obtained "signed statements describing the arrangement" from Mr. Troglia and Ms. McKinney's sisters. Before imputing to the settlor an intention that this is the "rare" case in which the beneficiary was permitted to invade the trust principal, the ALJ or the Appeals Council should have obtained signed statements from Mr. Troglia and Ms. McKinney's sisters describing the arrangement, including whether Ms. McKinney's sister would have withheld distributions if in her discretion a request was inconsistent with the settlor's intent.

Finally, the Court is very troubled by the allegations in the record regarding the ALJ's treatment of Ms. McKinney at the hearing. (Tr. 133-34; 143). The record indicates that Ms. McKinney filed a formal complaint against the ALJ. (Tr. 141). Regardless of the resolution of Ms. McKinney's complaint, this Court strongly suggests that the Social Security Administration transfer the case to a different ALJ on remand. See Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996).

### III. Conclusion

Because of the above described deficiencies in the record, the Court cannot find that the Appeals Council's decision is supported by substantial evidence. Plaintiff's Motion for Summary Judgment or Remand [20] is granted, and the Commissioner's Motion for Summary Judgment [26] is denied. Pursuant to sentence four of 42 U.S.C. 405(g), the ALJ's decision is reversed and the case is remanded to the Social Security Administration for further proceedings and development of the record consistent with this opinion. The

Clerk is directed to enter final judgment in favor of the Plaintiff and against the Commissioner in accordance with Rule 58 of the Federal Rules of Civil Procedure.

E N T E R :

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: April 6, 2007**